COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-153-CV
  
  
MILDRED DAVIS AND WILLIAM 
DAVIS                                  APPELLANTS
 
V.
 
CONVEYOR-MATIC INCORPORATED                                          APPELLEE
 
  
------------
 
FROM THE 236TH 
DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        In 
this case we are called upon to determine whether the trial court erred in 
granting summary judgment in favor of Conveyor-Matic Incorporated, appellee, on 
causes of action for strict liability based upon manufacturing, design, sale, 
and installation defects and negligence.  Because we hold that there is 
more than a scintilla of probative evidence regarding a defect, we reverse the 
trial court’s summary judgment and remand the case to the trial court for 
further proceedings consistent with this opinion.
Facts
        Appellant 
Mildred Davis was an employee on the assembly line in the moist sand division of 
the General Motors (GM) plant in Arlington.  Her husband William Davis, 
appellant, worked for GM as team leader of the moist sand department.  On 
the morning of March 19, 1998, Mildred arrived at work before six a.m. and began 
walking to her work station in the moist sand area.  However, instead of 
walking from the break area to her work station via a catwalk, she cut through a 
gap in the conveyor line (not a designated safe crossing area).  When she 
crossed between the two conveyor tables, metal in or on her purse activated the 
proximity switch,[1] causing the line to suddenly move 
forward.[2]  A large skid[3] 
carrying a truck body moved forward on the conveyor and struck Mildred on her 
side.  Mildred was trapped between the skid and the conveyor line.  
She suffered a fractured femur and injuries to her shoulders, back, and elbow.
        Appellee 
had designed and installed a manually operated conveyor system at the GM plant 
in 1989.  Where Mildred was injured, the conveyor system originally 
consisted of three tables numbered 687RFC, 688X, and 686RFC.  The tables 
were laid out in a line with table 687RFC on the west, 686RFC on the east, and 
688X in between, with gaps large enough to walk through.  A partially 
assembled vehicle would arrive on a skid via table 686RFC traveling west.  
An operator stationed on the north side of table 686RFC would inspect the paint 
job on the vehicle, and, if satisfactory, the vehicle would be transferred 
horizontally onto table 688X and onto the next conveyor leading back to the 
factory.  If the paint job was not satisfactory, the skid was transferred 
to table 688X and onto table 687RFC.  According to appellants, table 687RFC 
operated in both directions so it could return a skid back into the 
system.  According to appellants, to facilitate this operation, appellee 
installed a proximity switch at the interface of the two tables.
        CEC 
Products Co., Inc. (CEC) redesigned the conveyor system in 1994.  Both 
parties agreed that CEC’s redesign extended the length of the conveyor, and 
added a new drive.  Appellee contends that CEC also installed a proximity 
switch at the conveyor interface in order to make the transfer from one conveyor 
table to another an automatic function.  Appellants dispute appellee’s 
version of these facts and contends that although CEC did redesign the conveyor 
system, the proximity switch was not added by CEC because it was already there.
        Mildred 
and her husband filed suit against appellee for strict products liability and 
negligence. In their fourth amended original petition, appellants asserted a 
claim of strict products liability alleging that the conveyor system and 
component parts that appellee manufactured and installed were defective and 
unsafe for their intended purpose when they left appellee’s control.  To 
support their claim, appellants allege that the conveyor system was capable of 
starting automatically without warning, a gap existed between the conveyor 
tables that people could walk through even though it was dangerous, and no 
safety systems, interlocks or warning systems existed to prevent 
accidents.  Appellants also allege that these defects were the producing 
cause of Mildred’s injuries.
        Appellants 
also asserted a negligence claim against appellee because it designed, 
manufactured, and installed the defective conveyor system.  In support of 
this claim they point to these facts:
 
(1) no safety system was in 
place to prevent the conveyor from starting automatically;
 
(2) the conveyor had no 
warning systems; the space where people could cross between conveyor tables was 
dangerous and posed an unreasonable risk of harm;
 
(3) no physical barriers were 
in place to prevent people from crossing between the tables;
 
(4) no pressure mats existed 
in the gap to ensure that the conveyor would not start if a person was standing 
on the mat between the tables;
 
(5) there was no alarm system 
or time delay on the conveyor, and the conveyor was designed in a way that 
permitted it to be left energized between shifts, with no safety devices or 
warnings.
 
In addition to these primary 
causes of action, appellants also asserted negligence claims based upon the 
doctrines of res ipsa loquitor and respondeat superior, and made a bystander 
claim on William’s behalf.
        Appellee 
filed an amended motion for summary judgment seeking dismissal of appellants’ 
claims on the ground that the conveyor, as designed by appellee, was not 
defective because it did not include a proximity switch in the original design 
and had been substantially modified by CEC before the accident.  In support 
of its motion, appellee included:
 
(1) the pleadings of the 
parties;
(2) the depositions of 
Mildred, Warren Stelzer, GM senior project engineer, and Toby Eason, GM safety 
supervisor;
(3) GM’s business records;
(4) photos of the conveyor; 
and
        (5) 
a drawing of the conveyor system by Warren Stelzer.
  
        Appellee 
contended that there was no defect because, at the time it designed, installed, 
and manufactured the conveyor system, the system could not start up 
automatically because it was a manual system and did not have a proximity 
switch.  Therefore, appellee claims there was no defect and, thus, no 
producing cause.
        As 
to appellants’ negligence claims, appellee argued that there was no evidence 
to show that it owed a duty to the appellants or that its allegedly negligent 
acts were the proximate cause of the accident.  Appellee argued that 
because its original conveyor system could not have started automatically, it 
was not foreseeable such an accident would occur or that the system would 
eventually be converted into an automatic system.  Likewise, because it was 
manual, appellee had no duty to install any warnings, safety measures, alarms, 
pressure mats, or safety interlocks.  Specifically, appellee argued that: 
 
(1) because the conveyor 
system was not capable of automatic start up when appellee designed, 
manufactured, and installed it, it was not foreseeable that a person could be 
injured by an automatic start up;
 
(2) appellee had no duty to 
warn of automatic start up when the system was incapable of starting up 
automatically;
 
(3) the space between the 
conveyor tables was not unreasonably dangerous because the system could not 
automatically start, and other safe routes to Mildred’s workstation were 
available to her, but she chose not to take them; and
 
(4) because there was no 
possibility of automatic start up, there was no need for barricades, pressure 
mats, alarms, time delay features, and safety interlocks because it was not 
foreseeable that a manual system would be able to automatically start up.

        After 
appellee filed its motion for summary judgment, appellants filed their response 
and a fifth amended petition. Appellants’ summary judgment evidence included:
 
(1) depositions of Mildred, 
Warren Stelzer, Greg Perkin, expert witness, and William Davis;
 
(2) excerpts of depositions by 
Norbert Ulrich, president of Conveyor-Matic Incorporated, Toby Eason, and John 
Guadagnolo, paint plant manager;
 
(3) pages from Safety 
Standards for Conveyors and Related Equipment; and
 
(4) all other documents 
attached to appellee’s motion.
  
        Appellants 
contended that a fact issue existed regarding whether there was a proximity 
switch on the conveyor in appellee’s original installation.  Warren 
Stelzer testified that there was no proximity switch in the original system, yet 
Norbert Ulrich testified that there was.  Appellants also argued that they 
presented evidence to raise fact issues regarding the following:
  
(1) even if appellee had not 
installed a proximity switch, the system was still unreasonably dangerous 
because it could be left in energized mode between shifts without time delay 
start ups, interlocks, or warnings;
 
(2) it was foreseeable that 
persons would pass between tables and that a proximity switch may be added to 
the system; and
 
(3) appellees violated section 
5.11.2(b)(1) of the safety standards set out by the American Society of 
Mechanical Engineers (ASME).
  
        In 
their fifth amended petition, filed simultaneously, appellants added new 
allegations of negligence and products liability based upon appellee’s failure 
to conduct a hazard analysis to determine whether the conveyor system posed an 
unreasonable risk of harm to employees working near it, failure to train GM 
supervisors and assembly line personnel on how to reduce the risk of harm posed 
by the system’s ability to go into automatic start up without first going 
through an interlock phase, failure to design and install a system with 
emergency shut down switches or other devices, and failure to satisfy ASME 
standards applicable to conveyor systems with regard to the installation of 
warning systems.
        The 
appellee moved for summary judgment under both rules 166a(i) and 166a(c).  
The trial court granted summary judgment without specifying which provision it 
relied on. Therefore, we will first review the trial court’s judgment under 
the standards of rule 166a(i).  If the appellants failed to produce more 
than a scintilla of evidence under that burden, then there is no need to analyze 
whether appellee’s summary judgment proof satisfied the less stringent rule 
166a(c) burden.  Ford Motor Co. v. Ridgway, 47 Tex. Supp. Ct. J. 
266, 266, 2004 WL 250898, at *1( Tex. Feb. 6, 2004).
Summary Judgment 166(a)(c) Standard of Review
        A 
defendant is entitled to summary judgment if the summary judgment evidence 
establishes, as a matter of law, that at least one element of a plaintiff’s 
cause of action cannot be established.  Elliott-Williams Co. v. Diaz, 
9 S.W.3d 801, 803 (Tex. 1999).  The defendant as movant must present 
summary judgment evidence that negates an element of the plaintiff’s 
claim.  Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 
1995).  Once the defendant produces sufficient evidence to establish the 
right to summary judgment, the burden shifts to the plaintiff to come forward 
with competent controverting evidence raising a genuine issue of material fact 
with regard to the element challenged by the defendant.  Id.
        When 
a trial court's order granting summary judgment does not specify the ground or 
grounds relied on for its ruling, summary judgment will be affirmed on appeal if 
any of the theories advanced are meritorious.  Star-Telegram, Inc. v. 
Doe, 915 S.W.2d 471, 473 (Tex. 1995); Harwell v. State Farm Mut. Auto. 
Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995).  When the trial court's 
judgment rests upon more than one independent ground or defense, the aggrieved 
party must assign error to each ground, or the judgment will be affirmed on the 
ground to which no complaint is made.  Scott v. Galusha, 890 S.W.2d 
945, 948 (Tex. App.—Fort Worth 1994, writ denied).
Summary Judgment 166(a)(i) Standard of Review
        After 
an adequate time for discovery, the party without the burden of proof may, 
without presenting evidence, move for summary judgment on the ground that there 
is no evidence to support an essential element of the nonmovant's claim or 
defense.  Tex. R. Civ. P. 
166a(i).  The motion must specifically state the elements for which there 
is no evidence. Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 
193, 207 (Tex. 2002).  The trial court must grant the motion unless the 
nonmovant produces summary judgment evidence that raises a genuine issue of 
material fact.  See Tex. R. 
Civ. P. 166a(i) & cmt.; S.W. Elec. Power Co. v. Grant, 73 
S.W.3d 211, 215 (Tex. 2002).
        We 
review the evidence in the light most favorable to the party against whom the 
no-evidence summary judgment was rendered.  Johnson, 73 S.W.3d at 
197; Morgan v. Anthony, 27 S.W.3d 928, 929 (Tex. 2000).  If the 
nonmovant brings forward more than a scintilla of probative evidence that raises 
a genuine issue of material fact, then a no-evidence summary judgment is not 
proper.  Moore v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.—San 
Antonio 1998, pet. denied).
        Less 
than a scintilla of evidence exists when the evidence is so weak that it does 
nothing more than create a mere surmise or suspicion of a fact.  Kindred 
v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a 
scintilla of evidence exists when the evidence would enable reasonable and 
fair-minded people to reach different conclusions.  Merrell Dow Pharm., 
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  A genuine issue of 
material fact is raised by presenting evidence on which a reasonable jury could 
return a verdict in the nonmovant's favor.  Moore, 981 S.W.2d at 
266; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 
255-56, 106 S. Ct. 2505, 2513-14 (1986) (interpreting Fed. R. Civ. P. 56).
Strict Products Liability Claim
        Appellants’ 
strict products liability claim rests on whether the appellee designed, 
manufactured, and installed the conveyor system with a defect.  The 
proximity switch is the alleged defect.  In Texas, section 402A of the 
Restatement (Second) of Torts governs claims for strict liability in tort.  
Restatement (Second) Of Torts § 
402A (1965); Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 613 
(Tex. 1996).  To succeed on a claim for an injury on the theory of strict 
products liability in tort, the plaintiff bears the burden of proving that: (1) 
the defendant placed a product into the stream of commerce; (2) the product was 
in a defective or unreasonably dangerous condition; and (3) there was a causal 
connection between such condition and the plaintiff's injuries or damages.  
Houston Lighting & Power Co. v. Reynolds, 765 S.W.2d 784, 785 (Tex. 
1988); Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374, 376 (Tex. 1978); 
Hanus v. Tex. Util. Co., 71 S.W.3d 874, 878 (Tex. App.—Fort Worth 2002, 
no pet.)
        Under 
the Texas Civil Practices and Remedies Code, in a products liability action 
where a claimant alleges a design defect, the burden is on the claimant to prove 
by a preponderance of the evidence that: (1) there was a safer alternative 
design; and (2) the defect was a producing cause of the personal injury, 
property damage, or death for which the claimant seeks recovery.  Tex. Civ. Prac. & Rem. Code Ann. § 
82.005(a) (Vernon 1997).  All of the parties concede that various safety 
devices were available at the time the conveyor system was designed, 
manufactured, and installed, but were not included.  Therefore, we focus on 
whether the alleged defect was a producing cause of Mildred’s injuries that 
this manufacturer designed and installed.
        In 
its motion, appellee relies primarily upon the testimony of Warren Stelzer to 
conclusively negate appellants’ assertion that appellee included the switch in 
the original installation and design.  Warren Stelzer was the senior 
manufacturing project engineer in paint engineering at the GM plant and had been 
employed in that position since 1998.  He oversaw the paint department 
facilities, building, and equipment and made sure that they all functioned and 
operated at the best capacity.  Prior to 1998, Stelzer was employed by GM 
as the senior plant engineer.  However, Stelzer was not employed at GM when 
appellee originally installed the conveyor.
        Mildred’s 
accident occurred on March 19, 1998, and Stelzer was the senior manufacturing 
project engineer in the paint department at the time.  During his 
deposition, Stelzer described the original system and manner in which the skids 
were transferred along the conveyor lines in the plant.
        First, 
the paint department received unpainted truck bodies on skids via the conveyor 
system.  The bodies were then cleaned, electro-coated, baked, primed, 
painted, and polished as they proceeded through the department on top of a skid, 
along the conveyor line.  According to Stelzer, in the original conveyor 
system designed and installed by appellee, the skid arrived at sending table 
688X (installed by appellee) and an operator made the manual decision to 
transfer the skid to the original receiving table numbered 687RFC.  
However, Stelzer was not an employee at GM during the original installation and 
had no first hand knowledge of the installation.  To describe the original 
system’s design and function, Stelzer relied upon a blueprint of appellee’s 
original conveyor system as installed by appellee in 1989 through 1990 (exhibit 
number three admitted during his deposition).  However, appellee did not 
include a copy of the blue print as summary judgment evidence, nor was it ever 
filed with the trial court.
        When 
first asked whether the original design included a proximity switch, Stelzer 
stated, “I do not recall that there is a proximity switch there at the—at 
that transition from 688X to 687RFC.”  He continued, saying that the 
system, specifically table 687RFC, was redesigned in 1994 to accommodate an 
additional paint process and that CEC was the subcontractor selected to make the 
conveyor modifications.  As senior plant engineer, Stelzer oversaw the 
redesign of the conveyor by CEC in 1994.  During the redesign, conveyor 
table 877 was added as the receiving table, the conveyor was lengthened 110 
feet, and the pre-existing tail frame from the original receiving table (687RFC) 
was reused on the end of 877.  Table 877 was the table receiving the skid 
that was transferred when appellant was injured, and the proximity switch was 
located on the entrance to this table.
        Although 
Stelzer oversaw the installation of the modified conveyor system in 1994, he was 
not certain whether the proximity switch was added during the redesign.  
When asked whether a proximity switch was added to the modified conveyor system 
he said, “I don’t recall. I could probably find the answer to that question 
in some documents, but I don’t recall if a proximity switch was added or 
if—or if one existed prior to that.”  After reviewing documents that he 
brought to the deposition, Stelzer stated that, “I have no records of a 
proximity switch on the receiving table on the original design.  I did find 
a record of the proximity switch that was added by CEC Products in 1994, a 
proximity switch that was added at—at the entrance to that receiving 
conveyor.”  Shortly after this statement, Stelzer again stated that, 
based upon the documents that he brought with him to the deposition, he had 
found no record that there was a proximity switch on the conveyor when it was 
installed by appellee.
        During 
further examination, Stelzer described how the redesign changed the function of 
the conveyor system from a manual system into an automatic one.  He said 
that “a proximity switch was added in order to make the operation of the 
transfer from the sending table, 688, lift table number one, to the receiving 
tail frame, 877, roller flight conveyor.  The proximity switch was added in 
order to make that an automatic function.”  Stelzer then testified that 
without the proximity switch, an employee could not have activated the conveyor 
system just by passing through the gap in the conveyor line.  Next Stelzer 
looked at exhibit seven,[4] and was asked by 
appellee’s attorney, “I want to make sure we are clear.  The proximity 
switch was not installed by Conveyor-Matic [appellee], correct?”  Stelzer 
responded, “That is correct.”
        Stelzer 
referred to many exhibits during the deposition and at one point was asked to 
describe exhibit ten.[5] He stated:

Well this is a—a layout 
depicting the modifications that were made in 1994 to—to the area in 
question.  Specifically, that the Conveyor 687 was renamed Conveyor 877 and 
was then lengthened and there were also other modifications made in that area . 
. . in order to accommodate the—the wood grain decal operation.  What 
this drawing specifically shows is the addition of a proximity switch at the 
entrance end of that conveyor.

        Although 
appellee admitted exhibits of the conveyor system blueprints, both original and 
after the redesign, during the deposition, it did not attach any of them as 
summary judgment evidence, nor were those exhibits filed separately with the 
trial court.  Appellees did include, as summary judgment evidence, a 
drawing of the conveyor system by Stelzer and a photograph of the conveyor tail 
frame area.  Neither exhibit is determinative of the issue of whether the 
proximity switch was included in the original design or whether it was added by 
CEC during the redesign.
        Appellants 
point to the deposition testimony of Norbert Ulrich as evidence sufficient to 
raise a fact issue on whether the original design included a proximity 
switch.  Ulrich was appellee’s president when the original conveyor was 
installed and at the time of the deposition.  Only excerpts of his 
deposition were attached as summary judgment evidence.  With regard to the 
proximity switch Ulrich testified as follows:
Q. Okay, sir.  But the 
fact remains, if I understand you correctly, that the conveyor system that 
Conveyor-Matic installed there where Mrs. Davis was injured at the original 
installation did include proximity switches?
 
A. It is my complete 
understanding that the conveyor installation when installed where Mrs. Davis was 
injured was not our conveyor installation at all.
 
[PLAINTIFF’S ATTORNEY]: 
Okay.  I’m going to respectfully object to the responsiveness of your 
answer.
 
A. And yes, it did have 
proximity switches there.
 
Q. The Conveyor-Matic system 
did have proximity switches when it was first installed?
 
A. The Conveyor-Matic 
switches—yeah, we had proximity switches on our conveyor as did CEC and 
anybody else because it’s in the GM spec.
  
        Although 
Ulrich’s testimony is subject to interpretation, when viewed in the light most 
favorable to appellants, and in the absence of any documentation to conclusively 
show that the proximity switch was absent from the original design, we hold that 
Ulrich’s testimony was more than a scintilla of probative evidence to raise a 
genuine issue of material fact as to whether the proximity switch was part of 
appellee’s original conveyor design and installation.
        In 
a products liability action, a plaintiff must prove that the product was 
defective when it left the hands of the manufacturer and that the defect was a 
producing cause of the plaintiff's injuries.  Torrington Co. v. Stutzman, 
46 S.W.3d 829, 844 (Tex. 2000); Am. Tobacco Co. v. Grinnell, 951 S.W.2d 
420, 434 (Tex. 1997).  Appellee argues that the product was not defective 
because it did not include a proximity switch when it left its control.  
Because we hold that a fact issue exists on whether appellee installed the 
proximity switch in the original design, we must look at whether appellants 
presented more than a scintilla of evidence that the proximity switch was the 
producing cause of the accident.
        A 
producing cause is a substantial factor that brings about the injury and without 
which the injury would not have occurred.  Doe v. Boys Clubs of Greater 
Dallas, Inc., 907 S.W.2d 472, 481 (Tex. 1995).  Both parties conceded 
that the accident occurred when the proximity switch reacted to metal in or on 
Mildred’s purse and automatically activated the conveyor.  Stelzer 
testified that the activation of the conveyor by the proximity switch was the 
cause of the accident.  Appellee contends there is no evidence that its 
product was the producing cause of the accident because there was no evidence 
that the proximity switch was part of its original design and installation; 
therefore, the manual system could not have been the cause of the 
accident.  Appellants argue that there was a proximity switch in the 
original design and that it caused the accident.  Alternatively, appellants 
also argue that the system was unreasonably dangerous because it was capable of 
being left in an energized mode, without safety or warning devices.
        Because 
we hold that appellants produced more than a scintilla of evidence to raise a 
fact question on the issue of whether the proximity switch was in the original 
system, we hold that a fact issue also exists with regard to the producing cause 
of the accident.
Negligence Claims
        The 
essential elements of a negligence cause of action are a legal duty, a breach of 
that duty, and damages proximately resulting from that breach.  See Van 
Horn v. Chambers, 970 S.W.2d 542, 544 (Tex. 1998).  Appellee contends 
that there was no evidence presented to establish that it was negligent with 
regard to the design, manufacture, and installation of the conveyor 
system.  Appellee’s contention rests on its assertion that there was no 
proximity switch on the conveyor as originally designed and installed by 
appellee.  Appellants argue that they presented more than a scintilla of 
evidence to raise a fact issue on all elements of their negligence claim.
        Because 
we hold that appellants presented more than a scintilla of evidence to raise a 
fact issue on whether the original conveyor system included a proximity switch, 
and because the existence of a proximity switch is the basis for at least some 
of appellants’ negligence claims, we hold that they also raised an issue of 
material fact with regard to their negligence claims, res ipsa loquitor, 
respondeat superior, and bystander claims.  We sustain appellants’ first 
through sixth issues and hold that the trial court erred by granting summary 
judgment in favor of appellee when appellants presented more than a scintilla of 
evidence to raise a fact issue on their products liability and negligence 
claims.[6]
CONCLUSION
        Because 
we hold that there is more than a scintilla of probative evidence regarding a 
defect, we reverse the trial court’s summary judgment and remand the case to 
the trial court for further proceedings consistent with this opinion.

 
  
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
 
PANEL A:   CAYCE, 
C.J.; LIVINGSTON and GARDNER, JJ.
 
DELIVERED: June 10, 2004


NOTES
1.  
A switch that detects metal and automatically starts the conveyor system.
2.  
Mildred noted that the conveyor “came on by itself.”
3.  
A large metal frame that carried the unpainted truck bodies.
4.  
Exhibit seven was a photograph of the conveyor tail frame that was not included 
in the trial court’s file as summary judgment evidence.
5.  
Exhibit ten was a blueprint drawing by CEC products that was also not included 
in the trial court’s file as summary judgment evidence.
6.  
Because by sustaining these issues we must remand the case to the trial court 
and because sustaining any of appellant’s remaining issues would not require 
us to grant any greater relief, we need not address appellant’s remaining 
issues. See Tex. R. App. P. 
47.1.